IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


THOMAS EDWARD CARR, JR.               )
                                      )
v.                                    )        No.: 3:11-0805
                                      )
CAROLYN W. COLVIN,                    )
    Acting Commissioner of Social Security[1]   )


To: The Honorable Thomas A. Wiseman, Jr., Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the

final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's

claims for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"), as

provided by the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court recommends that the

plaintiff's motion for judgment on the administrative record (Docket Entry No. 11) should be

GRANTED to the extent that the case should be remanded to the ALJ.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this suit.

# I. INTRODUCTION

The plaintiff filed applications for SSI and DIB on May 21, 2007, with a protected filing date of April 27, 2007, alleging a disability onset date of September 15, 2006, due to back and hip injuries, high blood pressure, congestive heart failure, and chronic heart disease. (Tr. 82, 195, 203, 230.) His applications were denied initially and upon reconsideration. (Tr. 74-77.) A hearing was held before Administrative Law Judge ("ALJ") William Churchill on June 8, 2010. (Tr. 35-73.) The ALJ delivered an unfavorable decision on July 19, 2010 (tr. 17-29), and the plaintiff sought review by the Appeals Council. (Tr. 11-12.) On July 8, 2011, the Appeals Council denied the plaintiff's request for review (tr. 1-3), and the ALJ's decision became the final decision of the Commissioner.

# II. BACKGROUND

The plaintiff was born on October 15, 1963 and was forty-two years old as of September 15, 2006, his alleged onset date. (Tr. 28.) The plaintiff has a high school education and has worked as a truck driver. (Tr. 39-40.)

## A. Chronological Background: Procedural Developments and Medical Records

On September 22, 2006, the plaintiff presented to the emergency room at Williamson Medical Center with pain in his left arm as a result of a work-related accident. (Tr. 314-316.) He was diagnosed with an arm contusion and given a sling for comfort with instructions to use an ice pack and pain medication as needed. (Tr. 317.) On October 11, 2006, the plaintiff presented to Dr. Thomas J. O'Brien at Tennessee Spine and Sports Medicine, P.C., with pain in his left forearm and lower back. (Tr. 389.) A physical examination revealed mild swelling and tenderness in the left

arm, mild swelling and pain in the paraspinous back muscles, and a limited range of motion. (Tr. 390.) Dr. O'Brien prescribed Skelaxin and Tramadol.[2] (Tr. 391.) An x-ray of the lumbar spine revealed disc space narrowing at L5-S1 with small osteophyte formation at L4. *Id.* The plaintiff was released to light duty work with instructions to lift no more than twenty pounds and to limit his bending, stooping, and twisting. (Tr. 391, 400.) On October 31, 2006, the plaintiff attended physical therapy and noted improvement of his symptoms. (Tr. 399.)

On November 1, 2006, the plaintiff returned to Dr. O'Brien for an examination. (Tr. 388.) Dr. O'Brien reported that the plaintiff's symptoms had "subsided somewhat." (Tr. 388, 399.) Physical examination showed back tenderness, and the plaintiff's range of motion was limited by "body habitus."[3] (Tr. 388.) A neurological examination was normal, and Dr. O'Brien's impression was that the plaintiff suffered a "lumbar strain with likely degenerative disc disease." *Id.* The plaintiff was again released to light duty and instructed to lift no more than twenty pounds and to avoid repetitive bending and stooping. *Id.* Dr. O'Brien also recommended that the plaintiff be allowed to change positions as necessary or after standing for more than thirty to forty minutes. (Tr. 388, 398.)

On November 3, 2006, the plaintiff reported to Dr. Victoria Smith at Meharry Medical Clinic ("Meharry") for a follow-up on his hypertension. (Tr. 559.) He reported that he had not taken his hypertension medication that week, and Dr. Smith noted that he "rarely uses medication as prescribed." *Id.* She diagnosed the plaintiff with uncontrolled hypertension, stable chronic heart

---

[2] Skelaxin is a skeletal muscle relaxant, and Tramadol is a central analgesic for moderate to severe pain. Saunders Pharmaceutical Word Book 646, 715 (2009) ("Saunders").

[3] It is not entirely clear what Dr. O'Brien meant, but he may have been referring to the plaintiff's weight. On November 3, 2006, the plaintiff was 5' 11" and weighed 342 pounds. (Tr. 559.)

failure, and an upper respiratory infection. *Id.* She ordered him to continue his current medications of Zaroxolyn, Lasix, metoprolol, lisinopril, and aspirin, and she also prescribed KCL.[4] *Id.*

On November 7, 2006, the plaintiff requested that his light duty restriction be lifted, claiming that light work is "a.) humiliating, b.) giving him the flu and c.) making his back feel worse." (Tr. 387, 397.) He had been working one day per week sweeping and pressure washing the loading dock at his work, but he had not yet completed a shift. (Tr. 397.) Dr. O'Brien released the plaintiff to unrestricted activity, noting that the plaintiff's injury had not resulted in permanent impairment and that he expected the plaintiff to reach maximum medical improvement on the next visit. (Tr. 387, 394.) On November 30, 2006, after the plaintiff failed to appear for a scheduled appointment, Dr. O'Brien noted that a recent MRI revealed "advanced degenerative disc disease with Modic endplate changes and vacuum phenomenon with severe collapse of the L5-S1 disc," but "no acute changes." (Tr. 386, 392.) Dr. O'Brien noted that this condition pre-dated the plaintiff's work-related injury, adding that the plaintiff was not a candidate for surgery and that he had nothing further to offer the plaintiff. (Tr. 386.)

On March 21, 2007, the plaintiff returned to Dr. Smith for back pain, symptoms of type II diabetes mellitus, and orthopnea.[5] (Tr. 556-57.) He reported having been told that he snores and sometimes stops breathing in his sleep. (Tr. 556.) A physical examination showed a normal mood

---

[4] Zaroxolyn is an anti-hypertensive and diuretic; Lasix is an anti-hypertensive and diuretic; metoprolol is an antianginal and anti-hypertensive; lisinopril is an anti-hypertensive and "adjunctive treatment for congestive heart failure;"and KCL (potassium chloride) is a potassium supplement. Saunders at 774, 398, 448, 410, 387.

[5] Orthopnea is "difficulty in breathing that occurs when lying down and is relieved upon changing to an upright position (as in congestive heart failure)." Definition: "Orthopnea," at http://www.merriam-webster.com/medical/orthopnea. (Last visited March 6, 2013).

and affect, regular heart rate and rhythm, clear lungs, and no leg edema. *Id.* Dr. Smith diagnosed the plaintiff with chronic heart failure, hypertension, and back pain. *Id.* The plaintiff continued physical therapy through May 31, 2007, when his physical therapist noted that the plaintiff could achieve normal motion in all areas. (Tr. 403-404.) Specifically, the physical therapist recorded that the plaintiff's impairment "should not be a permanent restriction whatsoever" and that "[u]nder no circumstances do I believe that this person is permanently disabled." *Id.*

The plaintiff underwent an independent medical evaluation with orthopedic surgeon Dr. Richard E. Fishbein on April 24, 2007, for evaluation of his workers' compensation claim. (Tr. 324-26.) A physical examination showed that he was "overly-nourished" with antalgic gait and poor posture, a slow and stiff range of motion, and back tenderness with muscle spasms. (Tr. 325.) The exam also revealed marked scoliosis and a limited active range of motion due to pain and body habitus. *Id.* He had "sluggish" reflexes in his legs but showed no evidence of swelling and no indications of neurological, motor, or sensory deficits. *Id.* Dr. Fishbein concluded that the plaintiff would retain an 8% permanent impairment to his body as a whole and had reached maximum medical improvement. (Tr. 326.) He also concluded that the plaintiff should avoid excessive bending and twisting at the waist as well as stooping and squatting, adding that the plaintiff will require "continued symptom-relieving measures such as physician care, analgesics, rest, diagnostics, and physical/occupational therapy into the indefinite future." *Id.*

Nonexamining state agency medical consultant Dr. James Millis completed a physical residual functional capacity (RFC) assessment on June 19, 2007. (Tr. 414-21.) Dr. Millis opined that the plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; sit, stand, or walk for about six hours each in an eight-hour workday; and was not limited in pushing or pulling.

(Tr. 415.) Dr. Millis also opined that the plaintiff could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs but could never climb ladders, ropes, or scaffolds. (Tr. 416.) He found no manipulative, visual, communicative, or environmental limitations. (Tr. 417-18.) He also noted that the plaintiff's medical records showed normal heart function and no evidence of end organ damage due to hypertension. (Tr. 421.)

The plaintiff presented to Dr. Roger Zoorob at Meharry on August 31, 2007, with complaints of right knee pain. (Tr. 628.) A physical examination showed minimal knee effusion with no tenderness and 4/5 muscle strength. *Id.* However, Dr. Zoorob was unable to test the plaintiff's ligaments because the plaintiff was "unable to move around freely due to obesity." *Id.* He prescribed colchicine, noting that the plaintiff's symptoms were "suggestive of gout or [pseudo] gout."[6] (Tr. 629.)

The plaintiff presented to Dr. Smith at Meharry on September 6, 2007, for a follow-up on his hypertension and reported that he had not taken his blood pressure medication that day. (Tr. 626.) A physical examination showed that the plaintiff was morbidly obese with clear lungs, venous stasis changes in both legs, and pitting edema in both calves. *Id.* Dr. Smith diagnosed him with stable chronic heart failure, hypertension that was uncontrolled secondary to noncompliance with medication, fatigue that was likely secondary to morbid obesity, sleep apnea, and venous insufficiency. *Id.* She recommended that he lose weight to combat sleep apnea but also noted that he was unable to have a sleep study because he did not have health insurance. *Id.* Dr. Smith ordered

_____

[6] Colchicine is a gout suppressant. Saunders at 175.

the plaintiff to continue taking metoprolol, lisinopril, and Lasix, and she prescribed K-Dur.[7] (Tr. 626-27.)

Nonexamining state agency medical consultant Dr. William Downey completed a physical RFC assessment on November 27, 2007, and found identical limitations identified by Dr. Millis and "affirmed" his June 19, 2007 RFC without change. (Tr. 427-34).

On December 7, 2007, the plaintiff returned to Dr. Smith for a medication refill and checkup, and he reported that he had not taken his medication that day. (Tr. 624.) A physical examination showed clear lungs, regular heart rate and rhythm, and venous stasis changes in the legs with edema in the calves. *Id.* Dr. Smith again diagnosed the plaintiff with stable chronic heart failure, hypertension that was uncontrolled due to noncompliance with medication, fatigue likely secondary to morbid obesity, sleep apnea, and venous insufficiency. *Id.* Dr. Smith repeated that the plaintiff was unable to have a sleep study performed due to lack of insurance. *Id.* She also noted that he wanted help getting his disability papers signed but did not keep appointments or follow instructions. (Tr. 624-25.)

The plaintiff presented to Dr. Thomas Braxton at Meharry on December 18, 2007, with chest pain, shortness of breath, and swelling in his lower extremities. (Tr. 622-23.) A physical examination revealed shortness of breath with dry rales in both lungs. (Tr. 623.) Dr. Braxton advised the plaintiff to go to the emergency room for further evaluation (tr. 623), and he was hospitalized at Nashville General Hospital from December 19-22, 2007, with diagnoses of heart failure, hypertension, morbid obesity, and low back pain. (Tr. 645-46.) An echocardiogram was normal (tr. 473, 646), but a stress test revealed "abnormal nuclear perfusion imaging with evidence of lateral wall ischemia" and gated

---

[7] K-Dur is a potassium supplement. Saunders at 388.

SPECT images demonstrated "regional wall motion abnormalities with lateral wall hypokinesis." (Tr. 510-511.) The plaintiff exercised for the full length of the test with no complaints. (Tr. 473.) Cardiac catheterization showed no significant stenosis or findings, and, by the date of discharge, the plaintiff denied shortness of breath or chest pain and demonstrated clear lungs with no wheezing. (Tr. 498-99, 646.) Dr. Smith noted that the plaintiff's chronic heart failure exacerbation had been resolved and his blood pressure was largely under control. (Tr. 648.) A lumbar CT scan revealed degenerative disc changes at L5-S1, and an x-ray showed degenerative joint changes in both hips, marked on the right and mild to moderate on the left. (Tr. 471-72, 647.)

On December 28, 2007, Dr. Braxton completed a Medical Opinion Form and opined that the plaintiff could sit for a total of eight hours, four hours at a time, during an eight-hour workday, and stand or walk a total of five hours in an eight-hour workday, twenty minutes at a time. (Tr. 437-39.) He also opined that the plaintiff could frequently lift 1-5 pounds, occasionally lift 1-10 pounds, infrequently lift 11-20 pounds, and never lift 21 pounds or greater. (Tr. 437.) According to Dr. Braxton, the plaintiff would require six hours of bed rest during a normal workday and would require twenty minute breaks every hour. (Tr. 437-38.) He also believed that the plaintiff's conditions would cause lapses in concentration or memory on a regular basis and that he had a reasonable medical need to be absent from work for up to ten days monthly. (Tr. 438-39.)

The plaintiff returned to Dr. Braxton on January 29, 2008, for a follow-up for adult onset diabetes mellitus, hypertension, morbid obesity, chronic heart failure, and hyperlipidemia. (Tr. 446.) A physical examination showed clear lungs, leg edema, and a normal gait and station with normal sensation and reflexes. (Tr. 444.) The plaintiff demonstrated a normal mood and affect with intact memory, judgment, and insight. (Tr. 444-45.) Dr. Braxton diagnosed the plaintiff with adult onset

diabetes, hypertension, chronic heart failure, morbid obesity, and osteoarthritis. (Tr. 444-45.) On February 8, 2008, the plaintiff complained of knee pain and swelling lasting three days resulting from inflammatory arthritis (possibly gout or pseudo-gout). (Tr. 447-48.) He was prescribed indomethacin and Lortab for his pain.[8] (Tr. 447.) He followed-up with Dr. Braxton on February 29, 2008, reporting that his knee felt much better. (Tr. 450.) On examination, Dr. Braxton noted that the plaintiff was oriented with a normal mood and affect and demonstrated no knee tenderness with a normal range of motion and 4/5 muscle strength. (Tr. 449.)

A March 10, 2008 examination by Dr. Braxton showed that the plaintiff reported some relief but still experienced some recurring knee, hip, and back pain. (Tr. 452.) The plaintiff was oriented with a normal mood and affect, clear lungs, and decreased motion in his right knee. *Id.* He was diagnosed with uncontrolled hypertension, for which his dosage of metoprolol was increased from 50 to 100 mg, as well as acute gout and morbid obesity. (Tr. 452-53.) On March 17, 2008, the plaintiff was oriented with a normal mood and affect, clear lungs, lumbar tenderness, and tenderness in the hips and knees. (Tr. 454.) On March 31, 2008, he received counseling on nutrition and obesity. (Tr. 455.) A physical examination showed clear lungs, lower lumbar, hip, and knee tenderness, and decreased motion in the hips and knees. (Tr. 457.) He was oriented with normal mood and affect and intact recent and remote memory, and he was encouraged to exercise regularly. (Tr. 456-57.)

On July 10, 2008, the plaintiff presented to Meharry and reported that he was doing well with no complaints, adding that he wanted to go to the gym but needed a workout partner. (Tr. 611.) A note from August 29, 2008, indicated that the plaintiff did not return to the clinic as directed and

---

[8] Indomethacin is a "nonsteroidal anti-inflammatory drug (NSAID) for moderate to severe osteoarthritis, rheumatoid arthritis, ankylosing spondylitis, and acute bursitis/tendinitis." Lortab is a narcotic analgesic. Saunders at 368, 415.

needed to follow up. (Tr. 610.) On January 14, 2009, the plaintiff reported to Dr. Braxton that he was joining a weight loss group at his church and that his back and joint pain were well controlled with the medication diclofenac.[9] (Tr. 605.) A physical examination showed clear lungs, a regular heart rate and rhythm, and normal gait and station. (Tr. 607.) There was no evidence of muscle atrophy, decreased range of motion, or joint instability, and the plaintiff demonstrated normal sensation and reflexes. *Id.* He was oriented with intact memory and normal mood and affect. *Id.* Dr. Braxton diagnosed the plaintiff with morbid obesity, hyperlipidemia, hypertension, congestive heart failure, osteoarthritis, and adult onset diabetes mellitus. (Tr. 607-08.) He prescribed Vytorin, Lasix, K-Dur, and diclofenac.[10] (Tr. 609.)

Dr. Braxton visited the plaintiff at his home on March 19, 2009, after the plaintiff reported that he had been unable to come to the clinic due to financial reasons. (Tr. 602-04.) Dr. Braxton noted that the plaintiff walked around his home without falling and dressed and bathed himself. *Id.* He diagnosed the plaintiff with hypertension, noting that it was controlled with his current dosages of metoprolol and lisinopril. *Id.* He also diagnosed the plaintiff with mixed hyperlipidemia, recommending that the plaintiff receive additional diet control counseling, continue taking Zocor daily,[11] and increase his exercise regimen. *Id.* Dr. Braxton returned for a home visit on May 10, 2009, to assess the plaintiff's chronic heart failure, morbid obesity, and osteoarthritis. (Tr. 597-99.) The

---

[9] Diclofenac is an "analgesic; antiarthritic; nonsteroidal anti-inflammatory drug (NSAID) for ankylosing spondylitis." Saunders at 222.

[10] Vytorin is a "combination intestinal cholesterol absorption inhibitor plus HMG CoA reductase inhibitor to lower serum levels of LDL and total cholesterol." Saunders at 762.

[11] Zocor is an "HMG CoA reductase inhibitor for hyperlipidemia, hypertriglyceridemia, and coronary heart disease." Saunders at 778.

plaintiff complained of depression due to financial strain, his medical conditions, and a recently ended romantic relationship. (Tr. 598.) He told Dr. Braxton that he had considered trying to work despite his back and hip pain and that he had stopped exercising and was not following healthy eating habits. *Id.* Dr. Braxton reported that the plaintiff could walk around his home "to do the necessities," dress himself, and bathe himself "with difficulty cleaning backside after stooling unless in shower." *Id.* An examination showed clear lungs, tenderness in the low back, knees, and hips, and full strength in the arms and legs. *Id.* The plaintiff had normal sensation but demonstrated a lack of concentration and, according to Dr. Braxton, was "obviously depressed." *Id.* Dr. Braxton diagnosed the plaintiff with depressive disorder and recommended counseling, but he did not prescribe medication. (Tr. 599.)

The plaintiff visited the Veterans Affairs Medical Center ("VA") on June 4, 2009, for social work assistance. (Tr. 540.) He indicated that his primary concern was lack of employment, relaying his belief that he was not permanently disabled as well as his efforts toward finding a job. *Id.* He was examined at the VA on June 22, 2009, for obesity-related complaints including chronic low back pain, recurrent apneic episodes, and excessive daytime sleepiness. (Tr. 535.) The examination revealed a clear chest, normal muscle tone, and no edema. *Id.* He was diagnosed with hypertension, morbid obesity, arthritis, hyperlipidemia, and likely obstructive sleep apnea for which a sleep study was recommended. (Tr. 536.) He enrolled in a weight management program on June 24, 2009. (Tr. 532.)

The plaintiff returned to the VA on July 27, 2009, with complaints of back and hip pain. (Tr. 525-526.) A physical examination by Dr. Clinton Cummings showed clear lungs, brawny edema in both legs, and no calf tenderness. (Tr. 526.) The plaintiff was alert, coherent, and appropriate. *Id.*

Dr. Cummings increased the plaintiff's lisinopril dosage to treat his hypertension and ordered a sleep study after finding that the plaintiff had "likely" obstructive sleep apnea. *Id.* He started the plaintiff on simvastatin for hyperlipidemia and directed the plaintiff to continue taking diclofenac for arthritis.[12] *Id.* Dr. Cummings also recommended a weight loss program and physical therapy, and he ordered an X-ray and MRI of the plaintiff's spine. (Tr. 527.) A note from July 17, 2009, listed the plaintiff's current physical activity level at 30-59 minutes of moderate activity four days weekly and up to 29 minutes of vigorous activity once a week. (Tr. 521.)

The plaintiff presented to Dr. Braxton on September 29, 2009, and October 20, 2009, stating that his diclofenac no longer relieved his symptoms and complaining of low back pain, numbness in his left hand, and hip pain. (Tr. 589-90, 594-595.) Dr. Braxton's examination showed that the plaintiff had normal gait and posture, decreased range of motion, lumbar tenderness, and normal muscle strength and reflexes. (Tr. 590, 595.) Treatment notes document decreased sensation in the left hand and right leg and a painful right straight leg raise. *Id.* Dr. Braxton prescribed metoprolol, Hyzaar, Mobic, and Ultram,[13] recommended a pain management consultation, and advised the plaintiff to resume normal activities. (Tr. 590, 595-96.)

Physical examinations by Dr. Braxton on November 2 and 16, 2009, showed normal gait and posture, decreased range of motion and lumbar tenderness, and intact muscle strength and reflexes. (Tr. 702-06.) The plaintiff reported decreased sensation in the left hand and right leg, and a painful

---

[12] Simvastatin is an "HMG-CoA reductase inhibitor for hyperlipidemia, hypertriglyceridemia, and coronary heart disease." Saunders at 644.

[13] Hyzaar is an anti-hypertensive and diuretic. Mobic is an analgesic, nonsteroidal anti-inflammatory drug used to treat osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis. Ultram is an analgesic used to treat moderate to severe pain. Saunders at 359, 457, 739.

right straight leg test. (Tr. 703, 705.) Dr. Braxton continued to prescribe Mobic, Ultram, metoprolol, and Hyzaar and advised the plaintiff to resume normal activities. (Tr. 703, 706.) The plaintiff presented to Dr. Braxton again on December 1, 2009, and demonstrated clear lungs, normal gait and station, and tenderness and decreased motion in both hips and knees. (Tr. 699.) His recent and remote memory was intact, and his mood and affect were normal. (Tr. 700.) Dr. Braxton recommended a consultation for gastric bypass surgery and counseled the plaintiff on diet and exercise. *Id.*

On December 1, 2009, Dr. Braxton completed a Medical Source Statement in which he opined that the plaintiff could frequently lift less than ten pounds, occasionally lift up to twenty pounds, and never lift fifty pounds. (Tr. 461.) According to Dr. Braxton, the plaintiff could stand or walk less than two hours and sit for about four hours in an eight-hour workday, could occasionally use his upper extremities to operate hand controls, but could rarely or never use his lower extremities to operate leg controls. *Id.* He also opined that the plaintiff could rarely or never stoop or crouch and was only capable of completing less than two hours of an eight-hour workday on a sustained basis. (Tr. 461-62.) Additionally, Dr. Braxton estimated that the plaintiff would be absent for more than three days monthly and would need to take at least four to five breaks daily for thirty minutes at a time. (Tr. 462.) Dr. Braxton based his opinions on diagnoses of degenerative disc disease, severe arthritis, morbid obesity, "degenerative knee," hyperlipidemia, hypertension, chronic heart failure, and obstructive sleep apnea. *Id.* Dr. Braxton believed that the plaintiff was capable of handling low stress jobs intermittently for less than two hours daily three times per week. (Tr. 463.)

On December 15, 2009, the plaintiff reported to Dr. Braxton that he was taking metoprolol only once daily rather than twice daily as prescribed. (Tr. 694.) A physical examination showed

lower lumbar tenderness as well as tenderness and decreased motion in the hips and knees. (Tr. 695-96.) The plaintiff demonstrated a normal mood and affect and intact memory. (Tr. 696.) He requested a B12 prescription for fatigue and was informed that he had never showed signs of a B12 deficiency and that this would likely not help his fatigue. (Tr. 694.) Dr. Braxton assessed the plaintiff with joint pain in his pelvis and left leg, hypertension, morbid obesity, and fatigue syndrome. (Tr. 696.) He prescribed Mobic and instructed the plaintiff to exercise regularly and maintain a healthy diet. *Id.*

During a January 4, 2010 examination by Dr. Braxton, the plaintiff admitted that he was not taking his medication correctly or consistently and had not taken them that day. (Tr. 689, 691.) He requested an explanation of all of his medications and instructions for taking them correctly. (Tr. 689.) The plaintiff also reported that he was not maintaining a healthy diet and had gained weight. (Tr. 689-90.) A physical examination showed clear lungs, a regular heart rate and rhythm, normal legs with the exception of varicosities, and normal cranial nerves, sensation, and reflexes. (Tr. 690.) Dr. Braxton advised the plaintiff to continue taking his current medications at the same dose and prescribed pravastatin as a lipid lowering agent. (Tr. 691.)

The plaintiff presented for a hypertension follow-up on January 25, 2010, complaining of having difficulty staying asleep. (Tr. 684-85.) During the examination, the plaintiff was "well appearing" and oriented with normal mood and affect, gait, station, and reflexes, but with pitting edema in his ankles. (Tr. 686-87.) Dr. Braxton diagnosed the plaintiff with hypertension, congestive heart failure, morbid obesity, and unspecified sleep apnea. (Tr. 687.) He scheduled the plaintiff for a sleep study, noting that "[t]reating sleep apnea" was "essential" for controlling heart disease and blood pressure. *Id.* Noting that the plaintiff did not exercise and was essentially sedentary (tr. 686), Dr. Braxton again advised the plaintiff to exercise regularly. (Tr. 687.)

On February 8, 2010, the plaintiff followed up for low back pain, insomnia, hypertension, and obesity, and he complained of excessive thirst and urinary frequency. (Tr. 681.) Dr. Braxton noted that the plaintiff's "activity tolerance [was] essentially normal" and that his blood pressure was better controlled due to compliance with medication. *Id.* A physical examination showed normal gait and posture, decreased range of motion and lumbar tenderness, and subjectively decreased sensation. *Id.* The plaintiff demonstrated intact muscle strength and reflexes but complained of a painful right straight leg raise. *Id.* His medical history reflected a diagnosis of unspecified sleep apnea. (Tr. 676, 680.) Dr. Braxton assessed the plaintiff with hypertension, low back pain, morbid obesity, and joint pain in his left leg. (Tr. 681.) He prescribed Mobic and Lortab. *Id.* A February 22, 2010 examination showed that the plaintiff had not taken his blood pressure medication that morning as prescribed. (Tr. 676-77.) He had decreased range of motion and complained of decreased sensation and a painful right straight leg raise. (Tr. 677.) Dr. Braxton noted that the plaintiff had a scheduled appointment for a sleep study. (Tr. 676-77.)

A medical note on March 26, 2010, indicated that the plaintiff's blood pressure and lipids were uncontrolled but that he did not appear to be diabetic, and he was removed from diabetes case management. (Tr. 674.) On March 29, 2010, the plaintiff complained of insomnia, hypertension, urinary frequency, excessive thirst, and worsening pain in his low back, hip, and knee. (Tr. 672-73.) Dr. Braxton noted that his blood pressure was better controlled due to compliance. (Tr. 673.) A physical examination showed a normal gait and posture, decreased range of motion and lumbar tenderness, intact muscle strength, and subjective reports of decreased sensation. *Id.* The plaintiff's reflexes were normal, and he complained of a painful right straight leg raise. *Id.* Dr. Braxton

instructed the plaintiff to continue his current medications and advised him to pursue weight loss by exercising with a stationary bike and swimming. *Id.*

On May 28, 2010, Dr. Paul Alleyne opined in a Medical Source Statement that the plaintiff could frequently lift less than ten pounds, occasionally lift up to twenty pounds, and never lift fifty pounds. (Tr. 709.) Dr. Alleyne opined that the plaintiff could stand or walk less than two hours and sit for about four hours in an eight-hour workday, could occasionally operate hand controls, and could never operate foot controls. *Id.* He attributed the plaintiff's limitations to degenerative disc disease, severe arthritis, morbid obesity, "degenerative knee," hyperlipidemia, hypertension, chronic heart failure, and obstructive sleep apnea. (Tr. 710.) According to Dr. Alleyne, the plaintiff could rarely or never stoop or crouch and could complete less than two hours of an eight-hour workday. (Tr. 709-10.) He also opined that the plaintiff would be absent from work more than three days monthly and need four to five breaks daily for thirty minutes each but was capable of low stress jobs. (Tr. 710-11.)

**B. Hearing Testimony**

At the hearing before the ALJ on June 8, 2010, the plaintiff was represented by counsel, and both the plaintiff and Calvin Turner, a vocational expert ("VE"), testified. (Tr. 37-73.) The plaintiff testified that he was forty-six years old at the time of the hearing and has a high school education. (Tr. 39.) The plaintiff served in the military until his discharge in 1983, but he does not receive a military pension. *Id.* He testified that he is single, has lived with a roommate for the past three years, and has two sons who are sixteen and seventeen years old. (Tr. 39-40, 54.) He does not have a valid driver's license. (Tr. 40.)

The plaintiff is currently unemployed but previously worked as a truck driver for approximately sixteen years. *Id.* He testified that he stopped working as a truck driver after he hurt his back and arm when his truck flipped over on him. *Id.* The plaintiff said that he filed for workers' compensation and "was getting some rehab, but the company went out of business, and all that stopped." (Tr. 40-41.) He explained that he was laid off when the company went out of business in approximately June of 2009. (Tr. 41, 54.)

The plaintiff specified that his back and arm injuries prevent him from working and led him to file for disability. (Tr. 41.) He said that he had his back examined in 2007, but surgery was not recommended. *Id.* He testified that after the injury his pain ranked as a 5 on a 1 to 10 scale, but as time passed, the pain got worse. (Tr. 41- 42.) He testified that his pain is "regular" and rarely subsides but varies in severity. (Tr. 44, 59.) The plaintiff reported that taking medication seemed to make the back pain "a little worse" and that the medication never caused his pain to subside. (Tr. 42.) The plaintiff testified that he currently takes metoprolol, HCTZ, and Mobic for pain. *Id.* When asked whether Mobic relieved his pain, the plaintiff responded that he sometimes doubles the dosage and that when he does so, "it tends to sometimes help the relief," but also causes side effects such as drowsiness, diarrhea, and wheezing. (Tr. 42-43.) The plaintiff testified that he experiences back pain daily "[b]asically all day, even at night when I'm trying to sleep." (Tr. 44.) He relayed that some days were worse than others, adding that he has not been given any medication "that would make [the back pain] go away." (Tr. 59.)

When asked to describe his leg pain, the plaintiff testified that only his left leg used to swell but now both legs swell with fluid that oozes out through the skin causing pain in his calves and ankles. (Tr. 57-58.) He testified that Lasix only works when he lies down after taking the medication,

but, when he sits up, his legs start swelling again. (Tr. 58.) He also said that his right hip "tends to tingle and hurt a little bit" when standing or walking "too much" and when sitting down. (Tr. 59.)

The plaintiff testified that he gets tightness in both shoulders when he tries to do "normal things" around the house such as washing dishes or getting a glass of water. (Tr. 44.) He said that his shoulder problems are persistent and that he experiences pain "anytime if I'm trying to do anything." (Tr. 45.) He described his shoulder pain as "a numbing pain" and said that it sometimes makes him cramp and his fingers "lock." *Id.* He speculated that the cramping might be caused by carpal tunnel but said that he had not investigated it because his fingers only locked "every now and then." *Id.* The plaintiff stated that his left elbow pain "has gotten somewhat better, and I haven't really had any problems with it because I hadn't had anything to use it for." *Id*.

The plaintiff testified that he weighed 387 pounds at the time of the hearing. (Tr. 45-46.) He claimed that he was eating less but still gaining weight. (Tr. 46.) He said that he gained approximately twenty-one pounds in the three months preceding the hearing. *Id.* He attributed his weight gain to a lack of exercise and to the requirement that he eat food with his medicine. *Id.* When asked whether his weight interfered with his work or daily activities, the plaintiff responded that "it definitely does. I can barely bend over some days without cramping." (Tr. 47.) The plaintiff acknowledged that his doctor told him that his hypertension was "benign" and did not affect his organs or cause any other problems. *Id.* He added that he has not had any problems with his blood pressure "except for a lot of sweating" and that he is "lucky that [he has not] had a lot of blocked arteries and blood clots and things of that nature." *Id.* The plaintiff testified that his blood pressure medicine causes frequent urination and diarrhea and necessitates his using the bathroom nearly every

ten minutes. (Tr. 62-63.) He noted that he did not take his medication before the hearing because he did not want to "be running back and forth to the bathroom." (Tr. 56.)

The plaintiff testified that his doctor told him he was "borderline" diabetic and that he has a family history of diabetes. (Tr. 49-50.) He indicated that he did not have gout but has experienced "pseudo-gout" in his knee on one occasion and said that he is not taking medication for either diabetes or gout. (Tr. 50-51.) He reported that he once used an inhaler for asthma and wheezing two or three years ago but could not afford a new inhaler. (Tr. 51.) Regarding his sleep apnea symptoms, the plaintiff reported that he has been "trying to get tested for that for quite a few years" and was "hoping to have that done" before the hearing. (Tr. 52.)

The plaintiff testified that he was scheduled to begin seeing a mental health care professional a few days after the hearing because he was depressed. (Tr. 48.) However, he testified that he had not seen any health care provider on a consistent basis for his depression nor was he taking any medication for his mental health. (Tr. 51, 53.)

The plaintiff confirmed that Dr. Braxton is his primary care physician. (Tr. 52.) He claimed that he always complied with taking his prescribed medications, but he acknowledged that he has run out of medication on several occasions because he did not have money to pay for the medications. (Tr. 48-49.) The plaintiff added that his longest time without medication was two weeks but that, other than those occasions when he ran out, he tried to take his medication in a timely manner. *Id.* The plaintiff denied ever refusing medical treatment. *Id.*

He testified that his medications make him sleep during the day and that he dozes off when he watches television. (Tr. 53, 63.) He said that, on a typical day, he may sleep "about five hours on and off" between 8:00 a.m. and 4:00 p.m. (Tr. 63.) The plaintiff believed he was "basically unable"

to do anything during the day, and that, if he walks "too far," he gets out of breath very quickly. (Tr. 53-54.) He has used a walker and a cane in the past but testified that he was "too proud and too embarrassed to use it on a regular basis." (Tr. 44.) He acknowledged that he is able to move without a cane or walker. *Id.* He testified that he bathes himself, sweeps, washes dishes, folds clothes, shops for food, and changes the linens on his bed, but does not make up his bed in the morning, vacuum, or load or unload the washing machine. (Tr. 53-55.) He said that he cannot lift twenty pounds and can generally only lift one or two pounds, such as when he washes dishes. (Tr. 57, 63.) He testified that he has lifted pots weighing two or three pounds and estimated that he could lift up to five pounds, adding that if he tried to lift more, he would start sweating and panting. (Tr. 63-64.)

The plaintiff testified that he cannot sit for a complete hour when he has taken his medication because of frequent trips to the bathroom and cannot sit for an hour because his back hurts and most furniture causes him discomfort. (Tr. 56.) He estimated that he could sit for only two hours in a comfortable chair during the course of an eight-hour day because he would be "up and down going back and forth to the bathroom." (Tr. 65.) He said that he feels much more comfortable sitting in a reclined position than sitting upright and that he spends most of his days reclining and sometimes elevates his feet while doing so. (Tr. 66.) The plaintiff testified that he cannot usually sleep unless he is in an upright position, speculating that he conditioned himself to sleep in this position due to his years as a truck driver during which he would sleep sitting up. (Tr. 60.) He testified that he weighs too much to actually lie down when he sleeps and that he feels as though he is "drowning" in congestion if he lies down completely. *Id.*

The plaintiff estimated that he is able to walk for five or ten minutes at most without the support of a walker or similar device, relating that when he goes to the grocery store he uses a

grocery cart for support. (Tr. 64.) He also estimated that he could stand or walk for less than two hours in an eight-hour day. *Id.* He described his energy levels as low, explaining that his energy decreased when he became depressed one to two years ago. (Tr. 60-61.) The plaintiff testified that he has friends with whom he used to play video games. (Tr. 56.) He reported that he goes out for meals "every now and then" but does not go to the movie theater. *Id.* He reads the Bible, attends Bible study at church about once a month, watches television, and enjoys coloring in a coloring book, which he described as "therapy." (Tr. 55-56.)

The VE testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. 69.) He classified the plaintiff's prior work as a heavy truck driver as medium, semiskilled, with a Specific Vocational Preparation ("SVP") level of four.[14] (Tr. 67.) The ALJ asked the VE to consider a hypothetical person with the plaintiff's age, education, and work experience who can

> sit for six hours, stand and walk four to six hours; lift or carry 20 pounds occasionally, 10 frequently; can push or pull to those weights; occasionally crawl, squat, stoop or bend; no climbing of ladders, no working at heights; should avoid . . . continuous exposure to hazardous environmental pollutants, fumes, chemicals, smokes . . . can frequently handle, finger, feel and reach bimanually; can concentrate for extended periods of time; would respond appropriately to routine changes in the work environment and can perform detailed tasks.

_____

[14] The SVP "is defined as the amount of elapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." U.S. Dep't of Labor, Dictionary of Occupational Titles 1009 (4th ed. 1991). It is measured on a scale from 1-9 on which the higher number assigned to a job, the greater the length of time that is required to be able to perform the job. *Id.* An SVP level of four requires "[o]ver 3 months up to and including 6 months" of training to perform that specific work. *Id.*

(Tr. 67.) The VE replied that such a person would be precluded from performing the plaintiff's past relevant work. (Tr. 67-68.) However, these abilities would allow for employment in light, unskilled occupations such as office helper or room service clerk, jobs which the VE testified were available in the local, regional, or national economies. (Tr. 68.) The VE also testified that, if such a person could only lift and carry ten pounds occasionally, then he could perform available sedentary unskilled jobs such as charge account clerk and telephone quotation clerk. (Tr. 68-69.) However, when asked to consider a person who could lift less than ten pounds frequently and twenty pounds occasionally; stand and walk less than two hours and sit four hours; occasionally use his hands, arms, and shoulders but never use feet and legs; and never stoop or crouch, the VE responded that such a person would be precluded from all employment. (Tr. 69-70.) The VE also testified that for all of the jobs he identified, a person would not be allowed to miss more than one day per month or take unscheduled rest breaks lasting thirty minutes four to five times per day. (Tr. 70.) Finally, the VE testified that the individual's inability to stoop or squat would have no impact on the ability to perform any of the jobs he listed, explaining that crouching is negligible in the occupations of telephone quotation clerk, charge account clerk, and room service clerk and only occasional stooping is required in the occupation of office helper. (Tr. 71.)

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on July 19, 2010. (Tr. 17-29.) Based on the record, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through March 31, 2010.

2. The claimant has not engaged in substantial gainful activity since September 15, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, osteoarthritis of the bilateral hips, hypertension, history of congestive heart failure, gout, morbid obesity, depression (20 CFR 404.1520(c) and 416.920(c)).

\*\*\*

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

\*\*\*

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he is limited to standing and/or walking for a total of 4-6 hours in an 8-hour workday, with sitting for up to a total of 6 hours in an 8-hour workday. He is limited to no more than occasional crawling, squatting, stooping, or bending, and is able to frequently handle, finger, feel, or reach with his bilateral upper extremities, but is precluded from climbing ladders or working at heights. Further, he is to avoid continuous exposure to hazardous environmental pollutants, fumes, chemicals, or smoke. Finally, the claimant is able to concentrate for extended periods of time, to respond appropriately to routine changes in the work environment, and to perform detailed tasks.

\*\*\*

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

\*\*\*

7.    The claimant was born on October 15, 1963 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).[15]

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

\*\*\*

11.    The claimant has not been under a disability, as defined by the Social Security Act, from September 15, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).


## IV. DISCUSSION

**A. Standard of Review**

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social

---

[15] The Court notes that with a birth date of October 15, 1963, the plaintiff was forty-two years and eleven months old on the alleged disability onset date of September 15, 2006.

Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones* v. *Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d).

First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Foster*, 853 F.2d at 490 (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th

Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by his impairments and the fact that he is precluded from performing his past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the plaintiff can perform,

he is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The five step inquiry

In this case, the ALJ resolved the plaintiff's claim at step five of the five step process. (Tr. 28-29.) At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since September 15, 2006, his alleged onset date. (Tr. 19.) At step two, the ALJ determined that the plaintiff's severe impairments included degenerative disc disease of the lumbar spine, osteoarthritis of the bilateral hips, hypertension, history of congestive heart failure, gout, morbid obesity, and depression. *Id.* At step three, the ALJ determined that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20.) At step four, the ALJ determined that the plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with some additional limitations and that the plaintiff was unable to perform any past relevant work. (Tr. 21-28.) At step five, the ALJ concluded that the plaintiff was able to perform the requirements of representative light, unskilled occupations such as office helper and room service

28

clerk, and that, even if the plaintiff could lift no more than ten pounds occasionally, he could perform sedentary, unskilled jobs such as charge account clerk and telephone quotation clerk. (Tr. 28-29.)

## C. The Plaintiff's Assertions of Error

The plaintiff first contends that the ALJ erroneously found that he did not have sleep apnea. Next, he argues that the ALJ did not properly evaluate the side effects of diuretics in his RFC assessment and hypothetical question to the VE. Further, he contends that the ALJ erred in evaluating the opinions of his physicians by failing to provide a controlling-weight analysis and by failing to give good reasons for giving little weight to their opinions. Finally, he argues that the ALJ erroneously considered his history of noncompliance with prescribed treatment.

### 1. The ALJ properly excluded sleep apnea from his evaluation of the plaintiff's impairments.

The plaintiff contends that the ALJ erred in finding that he had never been diagnosed with obstructive sleep apnea. Docket Entry No. 12, at 5-6. The plaintiff's complaint stems from the ALJ's discussion of his RFC, in which the ALJ noted that, while Drs. Braxton and Alleyne opined that the plaintiff suffered from sleep apnea and extreme fatigue due to sleep apnea, the plaintiff "has never been diagnosed with obstructive sleep apnea, nor has he been treated for it." (Tr. 26.) The plaintiff argues that the ALJ's factual finding that he was never diagnosed with sleep apnea was incorrect and points to the following evidence in the medical record.

On September 6, 2007, Dr. Smith noted that the plaintiff complained of being easily fatigued and witnessing apneic episodes. (Tr. 626.) Dr. Smith diagnosed the plaintiff with sleep apnea and

advised him to lose weight but noted that the plaintiff was unable to participate in a sleep study because he did not have health insurance. *Id.* Doctor Smith entered identical notations in her notes following the plaintiff's checkup on December 7, 2007. (Tr. 624.) After visits to the VA on June 22, and July 7, 2009, the plaintiff's medical records indicate "Likely OSA: Sleep study consult" and "Likely OSA: SLEEP STUDY ORDERED."[16] (Tr. 526, 536.) An emergency room chart from Nashville General Hospital on October 30, 2009, listed "sleep disorder sleep apnea" in the plaintiff's medical and surgical history and diagnosed him with "sleep disorder NOS" (not otherwise specified). (Tr. 642, 644.) Dr. Braxton's medical records contain notations for "OTH UNSPCF. Sleep A" (tr. 672, 680) and indicate that the plaintiff had an appointment for a sleep study scheduled. (Tr. 676-77.) However, it appears that no sleep study tests were ever conducted. At the hearing, the plaintiff testified that he had never been tested for sleep apnea, stating "I've been trying to get tested for that for quite a few years – I was hoping to have that done before we got here." (Tr. 52.)

The plaintiff argues that the ALJ incorrectly found that he had never been diagnosed with sleep apnea and that this error affected the ALJ's decision in several ways. Docket Entry No. 12, at 6. First, he argues that the ALJ failed to consider the plaintiff's impairment of sleep apnea in combination with his other impairments. *Id.* Next, he argues that the ALJ's hypothetical question and RFC assessment do not account for any diminished concentration or exertion due to fatigue caused by sleep apnea. *Id.* Finally, he argues that the ALJ erroneously rejected the plaintiff's physicians' opinions based on the lack of evidence of sleep apnea.[17] *Id.*

---

[16] The Court assumes that the acronym "OSA" means obstructive sleep apnea.

[17] The Court will address this issue when considering whether the ALJ appropriately weighed the medical evidence.

30

The ALJ did not include sleep apnea in his listing of severe impairments at step two, and the plaintiff does not argue that sleep apnea constitutes a severe impairment by itself. Rather, the plaintiff argues that the ALJ failed to consider the plaintiff's sleep apnea in combination with his other impairments as required by 20 C.F.R. § 404.1523. However, if an ALJ fails to address a certain impairment at step two, "the error is harmless as long as the ALJ found at least one severe impairment and continued the sequential analysis and ultimately addressed all of the [plaintiff's] impairments in determining [his] residual functional capacity." *Swartz v. Barnhart*, 188 Fed. Appx. 361, 368 (6th Cir. July 13, 2006) (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). *See also* 20 C.F.R. § 404.1523 (When making a disability determination, the Regulations require that if one severe impairment exists, the Commissioner "will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.").

In this case, the ALJ found that the plaintiff suffered from several severe impairments and went on to consider the plaintiff's alleged impairment of sleep apnea when determining his RFC, but the ALJ ultimately concluded that the plaintiff's limitations from sleep apnea did not warrant inclusion in his RFC. (Tr. 19, 25-26.) Thus, it was harmless error for the ALJ to fail to address sleep apnea at step two. However, the Court agrees with the plaintiff that, in addressing sleep apnea in relation to his RFC, the ALJ incorrectly stated that the plaintiff had never been diagnosed with sleep apnea. (Tr. 26.) As discussed above, the medical record reflects diagnoses of sleep apnea (tr. 642, 644, 672, 687, 680), and the ALJ misstated the medical record in finding otherwise.

However, the Court is unpersuaded that the ALJ's factual error entitles the plaintiff to relief. The Regulations require that an impairment must result from an anatomical abnormality "which can

be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1508, 416.908. Such an impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only [a claimant's] statement of symptoms." *Id.* Here, the plaintiff was never tested nor treated for sleep apnea, and the diagnoses appear to be based solely on his subjective complaints. The medical record is replete with notations that sleep studies were ordered or needed based upon the plaintiff's suspected sleep apnea (tr. 526, 536, 624, 626, 659, 676-77), yet the plaintiff never participated in a sleep study. He acknowledged that he had failed to get tested for sleep apnea in the years preceding the hearing. (Tr. 52.) Thus, while the record does contain isolated diagnoses of sleep apnea, these diagnoses rely on the plaintiff's subjective complaints and do not appear to be based upon clinical observations or objective medical testing.

Moreover, the record does not contain any evidence showing functional limitations from sleep apnea. SSA Regulations require that the claimant produce evidence in the record of functional limitations from an impairment. 20 C.F.R. §§ 404.1512(c), 416.912(c). Aside from a few isolated complaints of fatigue (tr. 622, 624, 626), the medical record does not support the plaintiff's assertion that he experienced extreme fatigue and lack of concentration due to sleep apnea. On the contrary, examinations consistently showed that the plaintiff was alert, oriented, and demonstrated intact remote and short term memory.[18] (Tr. 324, 445, 449, 458, 525, 534, 541, 605, 616, 684, 690, 695, 699.) On those occasions when the plaintiff complained of fatigue, Dr. Smith associated the symptoms with obesity. (Tr. 624, 626.)

---

[18] The record contains a single isolated observation of diminished concentration, which Dr. Braxton apparently attributed to the plaintiff's depression. (Tr. 597-98.)

Thus, while the ALJ was incorrect to conclude that the plaintiff had never been diagnosed with sleep apnea, such a finding does not constitute reversible error because the plaintiff failed to objectively show the existence of an impairment or any resulting limitations. Although the ALJ's statement was imprecise, it was clearly intended to convey his conclusion that sleep apnea was not an impairment that limited the plaintiff in any significant way.

For this reason, the plaintiff's argument that the ALJ's hypothetical question does not account for diminished concentration or exertion due to fatigue caused by sleep apnea must also fail. The ALJ was not required to include limitations in his hypothetical question that were not supported by the record or not credible. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.1993) ("It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact."). Likewise, the ALJ was not required to include limitations in his RFC that he found not credible nor supported by the record.

### 2. The ALJ properly addressed the side effects of diuretics.

The plaintiff also contends that the ALJ did not properly evaluate the side effects of diuretics in determining his RFC. Docket Entry No. 12, at 14-15. The ALJ noted the plaintiff's hearing testimony that frequent urination was a side effect of his blood pressure medication. (Tr. 22.) However, the ALJ did not include such a limitation in his hypothetical question to the VE or RFC assessment. The medical record contains isolated complaints by the plaintiff of urinary frequency. (tr. 645, 657-58, 673, 681, 705.) However, none of the plaintiff's doctors suggested that urinary frequency created a functional limitation. Although the plaintiff argues that such a limitation should

have nevertheless been included in the ALJ's hypothetical question, the ALJ was not required to include limitations in his hypothetical question that were not supported by the record or not credible. *See Casey*, 987 F.2d at 1235. In the absence of evidence supporting a functional limitation for urinary frequency, the ALJ was permitted to omit such a limitation from his hypothetical question and RFC assessment.

### 3. The ALJ properly assessed and gave appropriate weight to the opinion evidence.

The plaintiff next argues that the ALJ erred in rejecting the medical opinions of Drs. Braxton and Alleyne. Docket Entry No. 12, at 6. Specifically, the plaintiff argues that the ALJ failed to provide a controlling weight analysis regarding these opinions and that the ALJ erred in assigning these opinions little weight. Docket Entry No. 12, at 9-11.

Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) . Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Even if a treating source's medical opinion is not given controlling weight, it is "still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . .*" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 30 (6th Cir. Aug. 19, 2009) (citing *Wilson*, 378 F.3d at 544); *Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 404.1527(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); *Brock v. Comm'r of Soc. Sec.*, 2010 WL 784907, at *2 (6th Cir. Mar. 8, 2010). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)), and so that the plaintiff understands the disposition of his case. *Wilson*, 378 F.3d at 544 (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

In this case, the ALJ reviewed the Medical Source Statements submitted by Drs. Braxton and Alleyne. (Tr. 26-27.) After noting that the statements were "virtually identical," the ALJ reviewed the functional limitations the doctors placed on the plaintiff, noting that, "[a]s symptoms affecting the claimant's ability to work, they listed extreme shortness of breath due to morbid obesity,

congestive heart failure, and sleep apnea; extreme fatigue due to sleep apnea, degenerative disc disease of the hip, knee, and back, and leg swelling due to congestive heart failure." (Tr. 26.) The ALJ continued:

> It is noted, however, that the claimant has never been diagnosed with obstructive sleep apnea, nor has he been treated for it. Moreover, the claimant's symptoms associated with congestive heart failure are well controlled as long as he is compliant with medication. The record also reflects that his symptoms of arthritic pain have been helped with medication. Moreover, physical examinations consistently reflect the absence of signs that would indicate compromise of the nerve root or spinal cord.

> Claimant's history of noncompliance was also noted by medical care providers at the Meharry Clinic on December 7, 2007, when the claimant requested their help by signing disability papers . . . . They noted that the claimant didn't keep clinic appointments or follow instructions. It is also noted that his medical care providers consistently recommended that he be more physically active. For instance, following his release from the hospital in December 2007, it was recommended that he walk and bike ride, as tolerated . . . . On March 29, 2010, they recommended that he lose weight by riding a stationary bike and swimming . . . . Recommending such activities is inconsistent with their statement expressing the opinion that claimant's extreme shortness of breath and fatigue prevents him from performing even 2 hours of work activities during an 8-hour workday. For the above reasons, the opinions of Dr. Braxton and Dr. Alleyne are given little weight.

*Id.* at 26-27 (internal citations omitted).

The plaintiff argues that the ALJ "failed to determine whether Dr. Braxton's and Dr. Alleyne's opinions . . . were owed 'controlling weight,'" and failed to give good reasons for according their opinions little weight. Docket Entry No. 12, at 9-10.

Although the plaintiff and the ALJ describe him as a treating physician, *see* tr. 26; Docket Entry No. 12, at 6, and although he is an acceptable medical source, *see* 20 C.F.R. § 404.1513(a), it does not appear that Dr. Alleyne is a treating source. Dr. Alleyne completed a Medical Source Statement on May 28, 2010, but there is no indication that he had any other contact with the plaintiff. In fact, Dr. Alleyne's Medical Source Statement does not indicate whether he examined the plaintiff

and no treatment notes are included in the record. (Tr. 709-11.) This falls well short of establishing a treating source relationship. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (a single examination of a patient by a doctor does not provide the requisite linear frequency to establish an "ongoing medical treatment relationship"); *Abney v. Astrue*, 2008 WL 2074011, at *11 (E.D. Ky. May 13, 2008) (a psychiatrist who met with the plaintiff one time and signed a psychological assessment of that visit was not a treating physician because one meeting "clearly cannot constitute the 'ongoing treatment relationship'" described in 20 C.F.R. § 404.1502). *See also* 20 C.F.R. § 416.903 (defining "treating source" and noting that the SSA will not consider an acceptable medical source to be a treating source if the relationship "is not based on [the claimant's] need for treatment or evaluation, but solely on [the claimant's] need to obtain a report in support of a claim for disability").

Because Dr. Alleyne is not a treating source, the treating physician rule does not apply, and his opinion was not entitled to controlling weight. *See Smith*, 482 F.3d at 876. However, the ALJ still must consider his medical opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). Here, the ALJ noted that Dr. Braxton's and Dr. Alleyne's opinions were identical, and he considered them together. (Tr. 26-27.) In doing so, he clearly gave Dr. Alleyne's opinion the consideration required by the Regulations. To the extent that their opinions are identical, the following discussion would also apply to Dr. Alleyne's opinion. However, because only Dr. Braxton is considered a treating source, the Court will address his opinion separately.

The plaintiff argues that the ALJ failed to determine whether Dr. Braxton's opinion was entitled to controlling weight. However, the Regulations only require the ALJ to evaluate each opinion and, if a treating physician's opinion is not entitled to controlling weight, the ALJ must give

"good reasons" for the weight ultimately assigned. *See* 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2). *See also* Soc. Sec. Rul. 96-2p, 1996 WL 374188. The Court is unpersuaded by the plaintiff's argument that a separate "controlling weight" analysis is required. The ALJ clearly evaluated Dr. Braxton's opinion in the context of its medical support and consistency with the record, and he ultimately decided to give it little weight.

Although the ALJ cited several reasons for giving Doctor Braxton's opinion little weight (tr. 26-27), the plaintiff argues that they were not "good reasons."[19] Docket Entry No. 12, at 10-11. First, the ALJ concluded that, while Dr. Braxton found that the plaintiff's sleep apnea limited his ability to work, the plaintiff was never diagnosed nor treated for obstructive sleep apnea. (Tr. 26.) As discussed above, this factual finding was inaccurate to the extent that the plaintiff had in fact been diagnosed with sleep apnea. However, as noted, the record does not contain objective evidence, such as clinical observations or tests, that the plaintiff suffered from sleep apnea, nor does it reflect that the plaintiff received treatment for sleep apnea or reflect functional limitations resulting from sleep apnea. Thus, while the ALJ was incorrect to conclude that the plaintiff had never been diagnosed with sleep apnea, the plaintiff's sleep apnea was not of such severity as to limit his ability to work in the manner described by Dr. Braxton. In the absence of objective evidence to support such

---

[19] In addition to contesting the reasons the ALJ gave for discounting Dr. Braxton's and Dr. Alleyne's opinions, the plaintiff also appears to argue that the ALJ did not properly evaluate their opinions in light of the specific factors outlined in 20 C.F.R. § 404.1527(c). Docket Entry No. 12, at 11; Docket Entry No. 16, at 8. The Court disagrees. Although there were no treatment notes for Dr. Alleyne in the record, the ALJ discussed in great detail the plaintiff's treatment history with Dr. Braxton, the supportability of the opinions of both doctors, and the consistency of their opinions with the medical record. (Tr. 22-27.) Moreover, while the ALJ is required to give good reasons for the weight given to an opinion, he is not required to provide "an exhaustive consideration of each factor" in section 1527(c). *See Stevenson v. Astrue*, 2010 WL 3034018, at *10 (M.D. Tenn. Aug. 3, 2010) (Nixon, J.).

limitations, the ALJ correctly discounted Dr. Braxton's opinion on this basis. Moreover, the ALJ did not rely on this reason exclusively and provided several additional reasons for discounting Dr. Braxton's opinion.

The ALJ also noted that the plaintiff's "medical care providers consistently recommended that he be more physically active" and exercise, and he concluded that these recommendations were "inconsistent" with Dr. Braxton's opinion that the plaintiff's "extreme shortness of breath and fatigue prevents him from performing even 2 hours of work activities during an 8-hour workday." (Tr. 26-27.) In his treatment notes, Dr. Braxton indicated that the plaintiff had a normal activity tolerance (tr. 590, 595, 673, 677, 681, 703, 705), encouraged him to resume normal activities (tr. 702, 706), and did not limit his physical exertion or advise him to refrain from activity. Such activity limitations appear in Dr. Braxton's December 2007, and December 2009 medical opinion forms restricting the plaintiff's work activity. (Tr. 437-39, 461-63.) However, during the course of his treatment, Dr. Braxton and other medical providers consistently encouraged the plaintiff to exercise regularly and suggested water aerobics, stationary bike riding, and swimming. (Tr. 453, 456, 558-59, 608, 620, 626, 646, 673, 687, 696, 700.) The Court agrees with the ALJ that such recommendations contradict Dr. Braxton's opinion that the plaintiff was so limited by extreme shortness of breath and other symptoms that he could work for only two hours in an eight-hour day and could stand and/or walk for no more than twenty minutes at a time.

As a third reason for discounting Dr. Braxton's opinion, the ALJ noted that the plaintiff's medical records did not indicate "compromise of the nerve root or spinal cord." (Tr. 26.) The plaintiff argues that "[t]here is no requirement for such a finding to show limited work capacity due to obesity and arthritis." Docket Entry No. 12, at 11. However, the Court does not interpret the ALJ's

statement as requiring the plaintiff to show nerve root or spinal cord damage. Rather, the ALJ was simply noting that while the plaintiff complained of degenerative disc disease and arthritic pain, the medical record did not reflect the existence of impairments significant enough to cause the functional limitations found by Dr. Braxton.

In sum, the ALJ determined that Dr. Braxton's opinion should be given little weight and gave good reasons for that decision.[20] The ALJ ultimately gave great weight to the assessments of the State agency medical consultants, Drs. Millis and Downey, after finding their opinions were more consistent with the medical record. (Tr. 27.) After a careful review, the Court concludes that substantial evidence supports the weight that the ALJ gave to the opinion evidence.

### 4. The ALJ erred by relying on the plaintiff's failure to follow prescribed treatment without determining whether the plaintiff satisfied the conditions of 20 C.F.R. § 404.1530 and Social Security Ruling 82-59.

The plaintiff argues that the ALJ erroneously relied on 20 C.F.R. § 404.1530 in finding that he failed to follow prescribed treatment without applying that regulation's specific requirements. Docket Entry No. 12, at 12-14. The Commissioner counters that the ALJ considered the plaintiff's noncompliance as one factor in his decision and that his citation to 20 C.F.R. § 404.1530 was harmless error. Docket Entry No. 15, at 24-27.

---

[20] In addition to the reasons set out above, the ALJ also apparently discounted Dr. Braxton's opinion because the plaintiff had not been compliant with taking his prescribed medications. (Tr. 26-27.) The plaintiff has not specifically argued that the ALJ erred by addressing the issue of noncompliance when assessing Dr. Braxton's opinion. Docket Entry No. 12, at 10; Docket Entry No. 16, at 7. The Court addresses the ALJ's consideration of the plaintiff's noncompliance with prescribed medication in more detail below.

In discussing the plaintiff's RFC, the ALJ stated that "[t]he objective medical evidence reflects that the claimant has a history of uncontrolled hypertension and congestive heart failure exacerbation, due to noncompliance with prescribed medications . . . ." (Tr. 22.) The ALJ then summarized the plaintiff's medical history related to hypertension and congestive heart failure, noting multiple times that the plaintiff had not taken his medications as prescribed, leading to his symptoms. (Tr. 22-24.) At the conclusion of the ALJ's discussion of these impairments, he stated that:

> While the medical evidence of record does show instances of swelling in [the plaintiff's] legs, it is noted that this usually occurs when the [plaintiff] is not taking his medications as prescribed. When he is compliant with prescribed medications and diet recommendations, his blood pressure normalizes and he has no edema in his legs. According to Social Security Regulations, failure to follow prescribed treatment without a good reason will result in a finding that the claimant is not disabled (20 CFR 404.1530).

(Tr. 24.)

The Regulations require a plaintiff to follow treatment prescribed by a physician if such treatment is able to restore his ability to work. 20 C.F.R. § 404.1530(a). If a plaintiff cannot provide good reasons for failing to follow the prescribed treatment, then he will not be found to be disabled. 20 C.F.R. § 404.1530(b). Social Security Ruling 82-59, codified in section 404.1530, provides that:

> [a]n individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot by virtue of such "failure" be found to be under a disability.

Soc. Sec. Rul. 82-59. *See also Ranellucci v. Astrue*, 2012 WL 4484922, at *10 (M.D. Tenn. Sept. 27, 2012) (Nixon, J.). Social Security Ruling 82-59 sets forth the following conditions that must be met before the SSA may determine that an individual has failed to follow prescribed treatment:

1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) . . . and

2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and

3. Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and

4. The evidence of record discloses that there has been refusal to follow prescribed treatment.

Where SSA makes a determination of "failure," a determination must also be made as to whether or not failure to follow prescribed treatment is justifiable.

Soc. Sec. Rul. 82-59. *Id.* Ruling 82-59 explains that, when a plaintiff is not undergoing prescribed treatment, he "should be given an opportunity to fully express the specific reason(s) for not following the prescribed treatment. Detailed questioning may be needed to identify and clarify the essential factors of refusal. The record must reflect as clearly and accurately as possible the claimant's . . . reason(s) for failing to follow the prescribed treatment." *Id.* Further, Ruling 82-59 lists several non-exhaustive "acceptable justifications for refusing to accept prescribed treatment," one of which is that "[t]he individual is unable to afford prescribed treatment which he or she is willing to accept, but for which free community resources are unavailable." *Id.*

A finding of disability is a prerequisite to the application of 20 C.F.R. §404.1530 and Social Security Ruling 82-59. *See Ranellucci*, 2012 WL 4484922, at *10 ("[F]ailure to follow prescribed treatment becomes a determinative issue only if the claimant's impairment is found to be disabling under steps one through five and is amenable to treatment expected to restore [his] ability to work.") (quoting *Hester v. Sec'y of Health & Human Servs.*, 886 F.2d 1315, 1989 WL 115632, at *3 (6th Cir. 1989)). *See also* Report and Recommendation entered in *Brewer v. Astrue*, 2010 WL 5488528, at

*7 (E.D. Tenn. Dec. 10, 2010) and adopted by the Court ("Finding that a claimant suffers from a disabling impairment is necessary to trigger an analysis under SSR 82-59."). As the plaintiff points out, the ALJ never found that he was disabled. Docket Entry No. 12, at 12. Without such a finding, section 404.1530 and Ruling 82-59 were not implicated. *See Brewer*, 2010 WL 5488528, at *7 (citing *Baker v. Astrue*, 2010 WL 1818045, at *5 (S.D. Ohio Apr. 15, 2010)). However, the ALJ's reliance on section 404.1530 is problematic because, although he was not required to apply that regulation, he apparently did so.

In addition to using evidence of noncompliance to support a finding of failure to follow prescribed treatment, an ALJ may also use evidence of noncompliance to assess a plaintiff's credibility. *See Ranellucci*, 2012 WL 4484922, at *10 (noting that Social Security Ruling 82-59 "does not restrict the use of evidence of noncompliance for the disability hearing") (quoting *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001)). S*ee also* Report and Recommendation entered in *Clark v. Astrue*, 2012 WL 3597202, at *8-9 (M.D. Tenn. Aug. 2, 2012) and adopted by the Court.

Consequently, evidence tending to show that the plaintiff had a pattern of noncompliance with prescribed medication was relevant for the ALJ to consider. As part of his analysis regarding Dr. Braxton's and Dr. Alleyne's opinions, the ALJ noted the plaintiff's "history of noncompliance," which included missing clinic appointments and failing to follow instructions. (Tr. 26.) Later, after giving their opinions little weight, the ALJ noted that the plaintiff's "extensive history of noncompliance with prescribed medication . . . suggests that his symptoms may not have been as limiting as he alleges. In general, the claimant's hypertension and congestive heart failure are well controlled as long as he is compliant with medications." (Tr. 27.) This statement clearly suggests that the ALJ considered the plaintiff's history of noncompliance as part of his credibility finding. The

Court concludes that the ALJ was permitted to rely on evidence of the plaintiff's noncompliance in this manner.

Had the ALJ limited his discussion of the plaintiff's noncompliance to the issue of credibility, he would not have committed error. However, earlier in his decision, the ALJ appears to discuss the issue of noncompliance in a different context. In his RFC, after discussing in great detail the plaintiff's history of noncompliance with his blood pressure medications (tr. 22-24), the ALJ specifically cited 20 C.F.R. § 404.1530 for the proposition that "failure to follow prescribed treatment without a good reason will result in a finding that the claimant is not disabled." (Tr. 24.) Yet, in doing so, the ALJ did not apply the specific requirements of 20 C.F.R. § 404.1530 and Social Security Ruling 82-59 to support his conclusion.

The Commissioner concedes that the ALJ erred by relying on section 404.1530 but argues that the error was harmless. Docket Entry No. 15, at 26; Docket Entry No. 19, at 1. The Commissioner maintains that the ALJ did not rely exclusively on section 404.1530 but merely cited the plaintiff's noncompliance as one of many factors in his decision. Docket Entry No. 15, at 24; Docket Entry No. 19, at 1.

"[I]t is an elemental principle of administrative law that agencies are bound to follow their own regulations." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004). We review decisions of administrative agencies for harmless error; consequently, "if an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless 'the [plaintiff] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) (quoting *Connor v. United States Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983)).

The Court cannot agree with the Commissioner that the ALJ's error was harmless. Although the ALJ was permitted to take the plaintiff's noncompliance into account when assessing his credibility, it appears that the ALJ did more than that. The ALJ's written decision is confusing because it does not directly find that the plaintiff failed to follow prescribed treatment but only cites approvingly to section 404.1530 for that proposition. (Tr. 24.) Additionally, the ALJ cites section 404.1530 in the middle of a lengthy discussion of the plaintiff's RFC, a discussion which also contains the ALJ's credibility finding based, in part, on the plaintiff's noncompliance. (Tr. 21-27.) In this way, the ALJ's reliance on 20 C.F.R. § 404.1530 is "inextricably intertwined" with his credibility determination. *See* Report and Recommendation enter in *Renneker v. Astrue*, 2011 WL 2559515, at *13 (S.D. Ohio April 4, 2011) and adopted by the Court (remanding in mental disability case where ALJ concluded that plaintiff's failure to follow prescribed treatment precluded disability but failed to develop record as to reasons justifying the plaintiff's failure). While the ALJ's credibility finding is entitled to deference, it is simply impossible to conclude that the ALJ considered the plaintiff's pattern of noncompliance solely in the context of credibility when he specifically cited the failure-to-follow-prescribed-treatment regulation as part of his RFC.[21]

---

[21] The ALJ's specific reliance on 20 C.F.R. § 404.1530 sets this case apart from other cases in this district such as *Ranellucci v. Astrue*, 2012 WL 4484922 (M.D. Tenn. Sept. 27, 2012) (Nixon, J.) and the Report and Recommendation entered in *Clark v. Astrue*, 2012 WL 3597202 (M.D. Tenn. Aug. 2, 2012). In those cases, the plaintiffs argued that they were entitled to analysis under Social Security Ruling 82-59. *Ranellucci*, 2012 WL 4484922, at *7-8, 10; *Clark*, 2012 WL 3597202, at *8-9. The Court concluded in both cases that, because the ALJ had not made a foundational finding that the plaintiff was disabled and had only addressed noncompliance in the context of credibility, Ruling 82-59 was not implicated. In this case, the ALJ specifically relied on the failure to follow prescribed treatment regulation and did not address noncompliance solely within the context of credibility. Thus, the question is whether it was error for the ALJ to rely on the regulation without determining whether the plaintiff satisfied its conditions.

It is clear that the ALJ based his decision that the plaintiff was not disabled in part on the plaintiff's periodic failure to take blood pressure medication as prescribed. In addition to his citation and reliance on 20 C.F.R. § 404.1530, the ALJ spent significant portions of his decision recounting the plaintiff's noncompliance, and, at one point, stated that the plaintiff's "history of uncontrolled hypertension and congestive heart failure exacerbation" was "*due to noncompliance with prescribed medication.*" (Tr. 22) (Emphasis added.) In fact, as to these specific impairments, it is difficult to find where the ALJ provided another reason for his conclusion that the impairments were not disabling.

The ALJ simply did not limit his reliance on the plaintiff's history of noncompliance to a credibility review. Instead, he based his decision that the plaintiff was not disabled from hypertension or congestive heart failure on the fact that the plaintiff sometimes did not take his blood pressure medication as prescribed. The ALJ was permitted to reach this conclusion. However, in order to do so, the ALJ must find that the plaintiff meets the conditions outlined in section 404.1530 and Social Security Ruling 82-59. Here, the ALJ did not even attempt to apply these conditions to the plaintiff's case.

In addition to reviewing the record to determine whether substantial evidence supports the ALJ's decision, the Court must also determine whether the ALJ applied the correct legal standards. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009). Consequently, "even if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a [plaintiff] on the merits or deprives the [plaintiff] of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

The Court concludes that it was prejudicial in this case for the ALJ to rely on section 404.1530 in denying benefits without also analyzing whether the plaintiff met the conditions of that regulation. The Court is particularly troubled by the lack of consideration or development of the record concerning the plaintiff's stated reason for not consistently taking his blood pressure medication – that he could not afford it. (Tr. 48-49.) Such a reason could have provided a justifiable excuse for the plaintiff's noncompliance with prescribed medication. *See* Soc. Sec. Rul. 82-59. At the hearing, the ALJ asked whether the plaintiff had been compliant with his medication or ever ran out of medication, and the plaintiff responded:

> Oh, I've run out of medication – well, I ran out of medication on several occasions. It's – people just didn't have the money. Eventually I would get back – I'd say the longest was about two weeks, I guess. But other than that, I would try to take the medication on – timely manner.

(Tr. 48-49.) Yet the ALJ did not follow up in a meaningful way and only requested that the plaintiff confirm that he had run out of medication "several times." (Tr. 49.) Given the plaintiff's stated reason, the ALJ should have questioned him in greater detail "with the goal of identifying and clarifying 'the essential factors of refusal.'" Report and Recommendation entered in *Franklin v. Astrue*, 2010 WL 2667388, at *9 (S.D. Ohio June 10, 2010) and adopted by the Court (quoting Soc. Sec. Rul 82-59). Consequently, the record fails to "reflect as clearly and accurately as possible the [plaintiff's] . . . reason(s) for failing to follow the prescribed treatment." *See id.* Just as importantly, the ALJ never addressed in his written decision the plaintiff's claim that he could not afford his medication. Social Security Ruling 82-59 clearly provides that in order to find that the plaintiff failed to follow prescribed treatment, the ALJ must also make a determination "as to whether or not failure to follow prescribed treatment [was] justifiable." Soc. Sec. Rul. 82-59.

The ALJ did not do so, and the result was prejudicial. Consequently, the plaintiff is entitled to remand. On remand, the ALJ should determine whether 20 C.F.R. § 404.1530 applies to the facts of this case. If the ALJ determines that the plaintiff failed to follow prescribed treatment under the conditions set forth in 20 C.F.R. § 404.1530 and Social Security Ruling 82-59, then he should determine whether the plaintiff had justifiable cause for his failure.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 11) be GRANTED to the extent that the case should be REMANDED for the ALJ to determine whether the plaintiff failed to follow prescribed treatment under the guidelines of 20 C.F.R. § 404.1530 and Social Security Ruling 82-59.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


Respectfully submitted,


JULIET GRIFFIN
United States Magistrate Judge

48